763 F.2d 1227
 38 Fair Empl.Prac.Cas. 38, 38 Empl. Prac.
Dec. P 35,505,
25 Ed. Law Rep. 196
 Dr. Anjali A. JOSHI, Plaintiff-Appellant,
v.
FLORIDA STATE UNIVERSITY HEALTH CENTER, Bernard Sliger, in
his capacity as President of Florida State University, Dr.
Homer Ooten, in his capacity as Director of Business
Affairs, Dr. Robert Hunter, in his capacity as Former
Director of Florida State University Health Center, Dr.
Phillip C. Rond, as Director of Florida State Health Center,
Defendants-Appellees.
 No. 84-3387.
 United States Court of Appeals,
Eleventh Circuit.
 June 21, 1985.
 
 Lindsey Gorman, Tallahassee, Fla., Algia R. Cooper, Pensacola, Fla., for plaintiff-appellant.
 Gene T. Sellers, Tallahassee, Fla., for State Bd. of Ed.
 Gerald B. Jaski, University Atty., Fla. State University, Tallahassee, Fla., for defendants-appellees.
 Appeal from the United States District Court for the Northern District of Florida.
 Before GODBOLD, Chief Judge, HATCHETT, Circuit Judge, and TUTTLE, Senior Circuit Judge.
 TUTTLE, Senior Circuit Judge:
 
 
 1
 Dr. Anjali Joshi appeals from a decision of the district court, 486 F.Supp. 86 (N.D.Fla.1980), holding that Florida State University ("FSU") did not discriminate against her in its failure to hire her for a position at the FSU Health Center between April and September 1976. We reverse.
 
 
 2
 A prior appeal in this case was decided by the Fifth Circuit in 1981. Joshi v. Florida State University, 646 F.2d 981 (5th Cir., Unit B, 1981), cert. denied, 456 U.S. 972, 102 S.Ct. 2233, 72 L.Ed.2d 845 (1982). The Court in this prior appeal ("Joshi I ") affirmed the district court's finding of no discrimination in three of the instances alleged by Joshi; however, the Court reversed the district court's ruling as to the fourth instance of discrimination holding that the district court had erroneously found that Joshi was no longer in the running for employment during the period from April to September 1976. The Court in Joshi I found that Joshi "was actively in the running for a position as staff physician" during this time period and directed that the district court determine on remand "whether the defendants produced or are now able to offer evidence of a legitimate, nondiscriminatory reason explaining their failure to hire Dr. Joshi." Id. at 990.
 
 
 3
 On remand, the district court applied the law of the case to the issue of whether Joshi was an applicant, indicating that the Court "was not free to re-examine the issue of whether or not this plaintiff was an applicant or an active applicant for the positions between the period of April '76 and September of '76. That issue was foreclosed by the opinion of the 5th Circuit Court of Appeals and the opinion of this Court."
 
 
 4
 The court found, however, that while plaintiff was an active applicant for the position, she was not actively considered because the people at FSU in charge of the hiring process did not in fact believe that she was an applicant. The court further found that "the persons ultimately chosen, that's Doctor Heller and Latti [Latey], had qualifications at least equal to those of the plaintiff" and that the fact that these doctors were better or equally qualified is the true reason for the employment decision.
 
 
 5
 Although the only issue on this appeal relates to the fourth alleged instance of discrimination, that relating to the hiring of two male physicians in September 1976, reference to the entire series of contacts between Joshi and the FSU Health Center is essential to an understanding of the factual context in which the instant allegation of discrimination arose. That factual context, largely as stated in Joshi I, is as follows: Joshi initially made a formal application for a position as staff physician in August 1975. During the middle of that month, she was interviewed by Dr. Robert Hunter, then director of the Health Center. According to his usual procedure, he conducted her through the medical center and introduced her to several physicians with whom she had brief interviews. Following the tour, Hunter polled the physicians who had met Joshi. None had any objections to her personality or attitude. Hunter found Joshi to be fully qualified for employment as a staff physician, but he needed written authorization from Dr. Homer Ooten, the University administrator with primary fiscal responsibility for the Health Center, before he could fill any position at the Center.
 
 
 6
 On August 18, 1975, Hunter submitted Joshi's name, along with the names of five other applicants he had found to be qualified, in a memorandum to Ooten requesting authorization to hire the six doctors. Hunter recommended the doctors in the order in which each had made a firm commitment to accept the appointment. Ooten approved the hiring of the first four on the list. As Joshi's name was fifth on the list, she was not hired.
 
 
 7
 On August 21, 1975, Hunter wrote Joshi to inform her that he had not received approval to hire her. He stated that she was "next on the list and [would] have the first opportunity for the next position that opens." On January 8, 1976, Hunter sent a memorandum to Ooten in which he requested authorization to hire Joshi "at the earliest possible date" since the Medical Center was understaffed and Joshi was next in line for employment in terms of qualifications and priority.
 
 
 8
 Ooten replied by memorandum dated January 19, 1976. He stated that he was concerned about the small number of physicians on the staff but that he felt that the fact that Joshi was next in line in terms of the date on which she had made a firm commitment to accept employment was insufficient justification for hiring her. He stated that he did not feel that a commitment had been made to Joshi despite the implications of Hunter's letter to her on August 21, 1975. He requested Hunter to arrange for a select group of staff physicians to interview Joshi and forward their comments regarding her to him by way of written recommendation.
 
 
 9
 On January 22, 1976, Dr. Joshi met with this committee. The next day, Dr. McHugh, who had chaired the committee, submitted a written report of the interview to Ooten. He stated therein that the committee had questioned Joshi about her past medical experience and reached the conclusion that she appeared well qualified for the position. However, he concluded with the statement that he felt the vacancy should be advertised to determine the availability of physicians prior to hiring any staff physicians. Ooten testified that he called a meeting of the committee members on February 20, 1976, in order to clarify the meaning of this report since it contained no clear recommendation either to hire or not to hire Joshi. He testified that he learned that some of the physicians had reservations about Joshi's qualifications.
 
 
 10
 Hunter stepped down from the position as director of the Health Center effective January 31, 1976. Dr. Phillip Rond became acting director on or about February 1, 1976. Hunter testified that he assumed the position of staff physician, apparently the position to which Joshi aspired, on January 31, 1976.
 
 
 11
 In early February 1976, Joshi telephoned Hunter to find out what had been the result of her interview. Hunter told her that he was no longer the director and that she should contact Ooten. Ooten told her that there was no vacancy.
 
 
 12
 On February 26, 1976, a staff physician at the Health Center resigned, creating a vacancy. On February 27, Ooten phoned Joshi and told her there was a vacancy for which they were going to advertise in the professional journals. That same day, Ooten wrote Joshi a letter to inform her that she was being considered for the position of staff physician. From March 11, 1976, through March 20, 1976, a staff physician position was posted as vacant in accordance with state personnel rules.
 
 
 13
 On March 17, 1976, a Physician's Selection Committee established by Rond made three recommendations: First, they recommended that Hunter be placed in the category of staff physician. Second, they recommended that Joshi's application be "tabled until the results of an advertisement have produced, or failed to produce, further applications." Finally, the committee recommended that the Health Center make an effort to employ at least two more full-time physicians.
 
 
 14
 On March 19, 1976, Ooten wrote Joshi to inform her that the position for which she was being considered was to be filled by Hunter. He stated that her qualifications were impressive but that the committee had "recommended the qualifications of the person selected over those of yourself." On April 2, 1976, Joshi filed charges of discrimination with the Equal Employment Opportunity Commission.
 
 
 15
 On April 23, 1976, another staff physician resigned, creating another vacancy at the Health Center. During the spring and summer of 1976, Rond sought applications for physicians at the Health Center. Although he advertised and actively recruited certain physicians, he made no effort to contact Joshi to notify her of the need for additional physicians at the Center.
 
 
 16
 On June 11, 1976, the Physician's Screening Committee met to review the curriculum vitae of doctors who had written about employment in order to choose one for employment in the immediate future. The committee recommended that a position be offered to Dr. Charles Freeble, III, and that interviews be set up with three additional applicants. Joshi's name was not mentioned. Freeble turned down the offer on July 19, 1976.
 
 
 17
 On July 25, 1976, an advertisement announcing the association of Joshi with another doctor in the practice of family medicine appeared in the Tallahassee Democrat. Joshi, however, testified that she never withdrew her application from the University despite this association.
 
 
 18
 In September 1976, Rond hired two male physicians for the Health Center, Dr. Latey and Dr. Heller. On June 14, 1978, Joshi filed suit in federal district court seeking damages and injunctive relief for the defendant's alleged violation of Title VII.
 
 I. ISSUES
 
 19
 The issues for decision by this Court are as follows:
 
 
 20
 1. Did the district court err in its application of law of the case?
 
 
 21
 2. Is the district court's finding that defendants rebutted plaintiff's prima facie case error?
 
 
 22
 3. If plaintiff proved discrimination, did defendant meet its burden of proof that plaintiff would not have been hired even in the absence of discrimination?
 
 II. DISCUSSION
 A. Law of the Case
 
 23
 The district court applied the law of the case doctrine to refuse to re-examine the issue of whether Joshi was an active applicant. The court found, however, that Joshi was not actively considered for hiring because the defendants did not in fact believe that she was an applicant.
 
 
 24
 Under the law of the case doctrine, both the district court and the court of appeals generally are bound by findings of fact and conclusions of law made by the court of appeals in a prior appeal of the same case. However, the law of the case doctrine does not apply to bar reconsideration of an issue when (1) a subsequent trial produces substantially different evidence, (2) controlling authority has since made a contrary decision of law applicable to that issue, or (3) the prior decision was clearly erroneous and would work manifest injustice. Further, while the doctrine encompasses only those issues previously determined, the law is clear that it "comprehends things decided by necessary implication as well as those decided explicitly."
 
 
 25
 Wheeler v. City of Pleasant Grove, 746 F.2d 1437, 1440 (11th Cir.1984) (citations omitted) (emphasis in original).
 
 
 26
 Joshi contends that the district court correctly applied law of the case to the finding that she was an active applicant and that none of the three exceptions applies. She further contends that law of the case applies to the statements in Joshi I that "offers" were made to particular male applicants. See Joshi I, 646 F.2d at 985, 985 n. 18, 990.
 
 
 27
 FSU argues first that law of the case applies only to the specific findings in Joshi I and not to "observations, commentary, or mere dicta touching upon issues not formally before the Court." Gertz v. Robert Welch, Inc., 680 F.2d 527, 533 (7th Cir.1982), cert. denied, 459 U.S. 1226, 103 S.Ct. 1233, 75 L.Ed.2d 467 (1983). Thus, it contends that the references in Joshi I to "offers" were dicta because the only issue was whether plaintiff had made a prima facie case, which includes a showing that defendants continued to seek applicants, not that they made offers. We disagree. The finding that offers were made to four male physicians was an essential component of the Joshi I court's holding that Joshi had made out a prima facie case. In Joshi I, the Court stated:
 
 
 28
 [W]e conclude that Dr. Joshi made out a prima facie case of employment discrimination in this final instance under the McDonnell Douglas standards and that the defendants have as yet failed to show a legitimate reason for their failure to hire her. She is a woman and thus a member of a class protected by Title VII. She had applied, and was qualified for a position for which the Health Center was actively recruiting applicants. The defendants made offers of employment to at least four male physicians during the period in question and ultimately hired two men to fill positions for which Dr. Joshi was qualified.
 
 
 29
 Joshi I, 646 F.2d at 990. As shown by this excerpt from Joshi I, the finding that offers were made to four male physicians was used to satisfy the requirement of the McDonnell Douglas test that plaintiff prove that the position remained open. Hence it was essential to the court's holding and is binding as law of the case. In addition, the Joshi I court found that "Dr. Rond also wrote to Dr. Charles Freeble, III, and Dr. William Burk encouraging them to accept offers of employment at the Health Center." Id. at 985 n. 18. This finding is an essential subsidiary finding supporting the finding that offers were made to four male physicians. The four males identified in Joshi I as receiving offers are Freeble, Burk, Heller, and Latey. Because this is an essential subsidiary finding supporting the court's holding that Joshi had made out a prima facie case, this Court is bound by law of the case to find that offers were made to Drs. Freeble, Burk, Heller, and Latey.
 
 
 30
 FSU further argues that the only relevant finding in Joshi I was that plaintiff had made out a prima facie case by showing that she "was actively in the running for a position." Joshi I, 646 F.2d at 990. FSU contends the Court in Joshi I specifically expected defendant to be allowed to produce evidence to rebut plaintiff's prima facie case, including her status as an applicant. Thus, defendant contends that law of the case is inapplicable. This argument is without merit. The Court in Joshi I specifically held that Dr. Joshi "was actively in the running for a position as staff physician during this period." The district court correctly found that this holding was binding as law of the case and refused to reconsider the question of whether Joshi was an applicant.
 
 
 31
 FSU next argues that even if law of the case might otherwise apply, two of the exceptions to the doctrine bar its use. First, FSU contends that the second trial produced substantially different evidence. We have reviewed this evidence and find that it is not substantially different evidence but rather evidence previously considered, information obtained by defendants after they decided not to consider plaintiff, or information not in evidence but presented on proffer only.
 
 
 32
 FSU also contends that a second exception to the law of the case doctrine applies: controlling authority has since made a contrary decision of law applicable to the issue. It points to Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), decided between oral argument and the opinion in Joshi I, and to Pullman-Standard v. Swint, 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982), decided subsequent to Joshi I. This argument is without merit. The Court in Joshi I considered and applied the Supreme Court's holding in Burdine. Although Pullman-Standard was decided subsequent to Joshi I, FSU has pointed to no disparity between the legal standards discussed in Pullman-Standard and those applied in Joshi I.
 
 B. Defendant's Burden of Rebuttal
 
 33
 The well-known requirement of a defendant-employer once a prima facie case of discrimination has been established is stated by the Supreme Court in Burdine, supra. There, the Court said:
 
 
 34
 The burden that shifts to the defendant therefore is to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, non-discriminatory reason. The defendant need not persuade the Court that it was actually motivated by the proffered reasons. See [Board of Trustees of Keene State College v.] Sweeney, supra [439 U.S. 24], at 25 [99 S.Ct. 295, 296, 58 L.Ed.2d 216]. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff. To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection. The explanation provided must be legally sufficient to justify a judgment for the defendant.
 
 
 35
 450 U.S. at 254, 101 S.Ct. at 1094 (footnotes omitted).
 
 
 36
 Here, the trial court found, without mentioning the term "rebuttal," that "the plaintiff was not actively considered for hiring between the period of April '76 and September '76 because the people at the University in charge of the hiring process did not in fact believe that she was an applicant."
 
 
 37
 This finding of fact is clearly erroneous for two reasons: (1) Drs. Hunter, Ooten and Rond, as well as the University's Equal Employment Opportunity officer, were intimately engaged in the hiring process so far as it related to Dr. Joshi. Not a single one of these persons other than Dr. Rond testified that he did not consider Dr. Joshi an applicant after April 1. Even Dr. Rond's testimony is far from explicit. His testimony with respect to this matter was as follows:
 
 
 38
 Q: Dr. Rond, during this period, that is between April and September of 1976, do you know if Dr. Joshi was considered for a position at the Health Center?
 
 
 39
 A: I would say that she was certainly in the mind of the people in the Health Center. Yes.
 
 
 40
 Q: Had she been interviewed by the committee?
 
 
 41
 A: She had been interviewed prior to March of 1976.
 
 
 42
 Q: Did you in any manner intend to exclude her from any consideration?
 
 
 43
 A: I didn't intend to exclude her.
 
 
 44
 Q: Did you think she was an applicant?
 
 
 45
 A: I didn't think she was an active applicant. No, I had no evidence that she was an active applicant.
 
 
 46
 Q: Why not?
 
 
 47
 A: I never had any contact from her of any sort.
 
 
 48
 Neither Dr. Hunter, who had originally told Dr. Joshi that she was "next on the list and [would] have the first opportunity for the next position that opens,"[1] nor Dr. Ooten who had written Joshi on February 27 to inform her that there was a vacancy for a staff physician for which she was being considered (without her having made a new application), nor the University Equal Employment Opportunity official testified that he or she did not believe Joshi was an applicant. Thus, even though the court's finding as to the conclusion reached by the defendants might have been sufficient so far as concerns Dr. Rond, there was clearly no evidence from which the trial court could make the finding of fact that "the plaintiff was not actively considered for hiring between the period of April '76 and September '76, because the people at the University in charge of the hiring process did not in fact believe that she was an applicant." (Emphasis added.)
 
 
 49
 (2) There is another purely objective reason for our holding that, even with respect to Dr. Rond, the evidence was simply overwhelming that all of the named defendants who actively participated in the series of events from the first consideration of Dr. Joshi's application actually knew that she was an applicant at the time of the vacancies.
 
 
 50
 Whether defendants' erroneous conclusion that Joshi was not an applicant is a legitimate non-discriminatory reason for not considering her depends upon the facts. That is to say, there must be a showing of some factual basis to support the "conclusion of the defendants." The critical facts bearing on this issue as developed at the second trial are as follows:
 
 
 51
 A. The very persons who the court found "did not in fact believe that she was an applicant," were precisely the same persons whose conduct caused us to conclude in Joshi I that Dr. Joshi was a current applicant.
 
 
 52
 B. Dr. Hunter told Joshi on August 21, 1975, that she was "next on the list and [would] have the first opportunity for the next position that opens" (without telling her she need file a new application).
 
 
 53
 C. Five months later, on January 8, 1976, Hunter sent a letter to Ooten requesting authorization to hire Joshi "at the earliest possible date" [without her having made a new application].
 
 
 54
 D. On February 27, 1976, Dr. Ooten telephoned Joshi and wrote her a letter to inform her that there was a vacancy for a staff physician for which she was being considered (without her having made a new application).
 
 
 55
 E. On March 19, she was notified by Ooten that Dr. Hunter, the Director of the Health Center for five years, had been placed in the position she had sought, although her qualifications were "impressive." He ended his letter: "Thank you for your interest in employment at Florida State University."
 
 
 56
 F. At the March 19th meeting, the Physician's Selection Committee considered the pending applications and at that meeting the Committee voted that Dr. Joshi's application be "tabled until the results of an advertisement have produced or failed to produce further applications." (Emphasis added.)
 
 
 57
 G. In an affidavit of June 3, 1976, by Dr. Groomes, the University Equal Employment Opportunity official she stated: "I have discussed [Dr. Joshi's] interest in employment with appropriate University officials and have reaffirmed with them that her application be considered fairly and that she continue to be advised regarding her status as a candidate for any vacancies which might occur at the University Health Center." (Emphasis added.)
 
 
 58
 H. There is no indication in the record that at any time was Dr. Joshi's application "untabled" by any official connected with the hiring process and, of course, she was never notified that her application was not still "on the table."
 
 
 59
 Finally, the defendants cannot rely upon the fact that Dr. Joshi had placed a notice in the Tallahassee Democrat advertising her association with another doctor in the practice of family medicine. As we stated in Joshi I:
 
 
 60
 The fact that this ad appeared in the paper, however, is insufficient to support a finding that the defendants did not consider Dr. Joshi's application because they believed that she was employed elsewhere and, therefore, was no longer interested in employment as a staff physician at the Health Center.... Moreover, the ad did not appear in the newspaper until July, 1976, and, therefore, can not even be considered as an explanation for the defendants' failure to consider Dr. Joshi's application at the June 11, 1976, meeting of the physicians screening committee to review the applications then on file.
 
 
 61
 Joshi I at 646 F.2d 981, 989.
 
 
 62
 Thus, we have a situation in which Dr. Joshi herself testified that she had not withdrawn her application, that members of the selection group and other officials of the University had told her that she was to be considered for the next vacancy and also told her that she was actually being considered. As we previously stated in Joshi I: "The evidence overwhelmingly supports the conclusion that Dr. Joshi remained actively in the running for employment at the Health Center during the time period after she was notified that Dr. Hunter had been selected to fill a position as staff physician." 646 F.2d at 989. In light of the above recited facts showing the participation of the University officials in the acts upon which we based that conclusion, it would be sophistry for us to hold that there is any factual support for the defendants' claim that they did not know she was an applicant. All the facts are to the contrary.
 
 
 63
 We, therefore, conclude that the trial court's finding that the defendants "did not in fact believe that she was an applicant" is clearly erroneous. The defendants have therefore failed to satisfy the requirements of Burdine that they "clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection" which "must be legally sufficient to justify a judgment for the defendant." 450 U.S. at 254, 255, 101 S.Ct. at 1094, 1095.
 
 
 64
 FSU also attempted to rebut Joshi's prima facie case by showing that the males hired or offered the position were at least as qualified as she. This articulated reason is insufficient as a matter of law. The district court found that "the plaintiff was not actively considered for hiring" during this period. This finding is supported by the facts that no one contacted Joshi and that her application was not considered by the screening committee or the director. Because she was not considered, her qualifications were not compared to those of the male applicants and hence, the relative qualifications of those applicants cannot be a reason for the defendants' failure to hire her. In Eastland v. Tennessee Valley Authority, 704 F.2d 613, 626 (11th Cir.1983) cert. denied, --- U.S. ----, 104 S.Ct. 1415, 79 L.Ed.2d 741 (1984), this Court stated:
 
 
 65
 The district court found that even if Eastland established that he was qualified for the position, TVA's hiring decision was justified because the white applicant had superior qualifications. But TVA's selecting supervisor did not know whether the white applicant's qualifications were superior at the time the hiring decision was made. TVA's decision cannot be defended on the basis of the relative qualifications of the applicants if these qualifications were not considered.
 
 
 66
 Similarly, in this case, because Joshi's qualifications were not considered, FSU cannot rely on its contention that other candidates were better qualified to explain its decision not to hire her.
 
 
 67
 We conclude, therefore, that neither of the reasons articulated by defendants is sufficient to rebut Joshi's prima facie case. She has thus established that FSU discriminated against her in its failure to select her for a position at the University Health Center.
 
 
 68
 The district court stated in its oral decision, "there is no evidence before this court and the court finds that her gender was not a factor in her failure to be considered or to have her application considered." This finding is erroneous as a matter of law. Joshi has proven sex discrimination in the method established by the Supreme Court in McDonnell Douglas Corporation v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). We held in Joshi I that she had established a prima facie case of discrimination. We have here held that defendants' articulated reasons for failing to hire her are legally insufficient. Hence, the prima facie case stands unrebutted, and discrimination is established. See Burdine, 450 U.S. at 254, 101 S.Ct. at 1094 (1981). Thus, plaintiff has established that sex was a factor in defendants' decision not to consider her. The presence or absence of direct evidence that sex was a factor is irrelevant.
 
 
 69
 C. Defendants' Showing that Plaintiff Would Not Have Been Hired Even in the Absence of Discrimination
 
 
 70
 "Once discrimination has been proven, whether by circumstantial or direct evidence, a presumption of entitlement to appropriate remedies such as injunctive and/or declaratory relief, as well as hiring and back pay arises. The burden then shifts to the employer to rebut the presumption by showing that the discriminatee would not have been hired absent the discrimination." Lewis v. Smith, 731 F.2d 1535, 1538 (11th Cir.1984) (citations omitted).
 
 
 71
 The district court found that "the persons ultimately chosen, that's Drs. Heller and Latti [Latey], had qualifications at least equal to those of the plaintiff." The court's finding that Heller and Latey were at least as qualified as Joshi is not clearly erroneous. This fact, however, is insufficient to meet defendant's burden of showing that Joshi would not have been hired absent the discrimination. In Joshi I we found that two other physicians, Burk and Freeble, were also offered the position. This finding is binding on this Court as law of the case. In order to prove that Joshi would not have been hired even in the absence of discrimination, defendants are required to show by a preponderance of the evidence[2] that all those to whom the position was offered, not merely those ultimately employed, were better qualified than Joshi.
 
 
 72
 The district court made no findings as to the relative qualifications of Joshi and the two offerees. Ordinarily, we would remand to the district court for a finding on this factual question. In the instant case, however, a remand is unnecessary. There is nothing in the record below from which the court could conclude that Burk was better qualified than Joshi. In fact, the Director of the Health Center admitted that he did not have a resume for Dr. Burk and responded on cross-examination as follows:
 
 
 73
 Q: In fact, today you can't tell us what his [Burk's] qualifications were, can you?
 
 
 74
 A: No. The only thing I recall about him is that he was at a student health center in North Carolina, Chapel Hill, right?
 
 
 75
 Hence, there is no evidence from which the Court could conclude that all of those to whom the job was offered, including Burk, were better qualified than Joshi. Defendants have thus failed to meet their burden of proving that Joshi would not have been hired in the absence of discrimination.
 
 III. CONCLUSION
 
 76
 Joshi established a prima facie case of discrimination as we previously held in Joshi I. The defendants' articulated reasons for failure to hire her failed to rebut that prima facie case. We hold, therefore, that Joshi has established that FSU discriminated against her by failing to hire her as a staff physician. The defendants have not carried their burden of proving that Joshi would not have been hired in the absence of discrimination. Hence, we hold that Joshi is entitled to appropriate relief, including hiring and back pay. We remand for the district court to enter a judgment consistent with this opinion.
 
 
 77
 REVERSED and REMANDED.
 
 
 
 [1]
 Dr. Hunter did not advise her that it would be necessary for her to file an additional application
 
 
 [2]
 The standard of proof is described in Lewis as follows:
 Since the Mt. Healthy [City Bd. of Ed. v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) ] decision, which involved constitutionally protected conduct, even though not a violation of Title VII, this court and the Fifth Circuit have required a showing "by a preponderance of the evidence" that the plaintiff would not have been hired absent the discriminatory action. Id. at 287, 97 S.Ct. at 576. Perryman v. Johnson Products Co., Inc., 698 F.2d 1138 (11th Cir.1983); Bell v. Birmingham Linen Service, 715 F.2d 1552 (11th Cir.1983); Lee v. Russell County Bd. of Ed., 684 F.2d 769 (11th Cir.1982); Ramirez v. Sloss, 615 F.2d 163 (5th Cir.1980).
 731 F.2d at 1539. See also, Walker v. Ford Motor Co., 684 F.2d 1355, 1362 (11th Cir.1982).